**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JONATHAN AMADOR ACEVEDO, MITCHELL BRATTON, JEREMY BUSSE, STEPHEN PULLUM, ERIC MIGDOL, and JOSE GONZALEZ,** *individually and on behalf of all others similarly situated,* | : : : : : | **CIVIL ACTION NO. 3:13-2529** **(JUDGE MANNION)** |
| **Plaintiffs,** | : | |
| **v.** | : | |
| **BRIGHTVIEW LANDSCAPES, LLC, (f/k/a/ THE BRICKMAN GROUP LTD. LLC),** | : : | |
| **Defendant.** | : : | |

**MEMORANDUM**

Currently before the court are the named plaintiffs' unopposed motion for final approval of the parties amended settlement agreement, (Doc. 122), and the named plaintiffs' unopposed motion for attorneys' fees, (Doc. 121). Having reviewed and considered the named plaintiffs' motions, both memorandums in support of the motions, and having held a final fairness hearing, the named plaintiffs' motions will be granted and the parties amended settlement agreement, (Doc. 118-3), will be finally approved.

## I.    BACKGROUND

This action is a putative class action against the defendant, BrightView Landscapes, LLC ("Brightview"), formerly known as The Brickman LTD. LLC.,

under the Fair Labor Standards Act, 29 U.S.C. §201, *et seq.* ("FLSA") and state wage and hour laws across twenty-seven states, specifically, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia, Washington, and Wisconsin. (Doc. 103 at 1–2). The defendant is a national landscaping and snow removal company. The named plaintiffs were non-exempt, salaried landscape/crew/irrigation supervisors working for the defendant in various locations across the country who, on behalf of themselves and all others similarly situated, alleged that, between October 8, 2010 and June 8, 2014, the defendant had a policy and practice of failing to pay its employees who were paid on a half-time, fluctuating workweek ("FWW") basis all overtime compensation owed in accordance with the FLSA and state wage and hour laws. (Doc. 103).

In particular, the named plaintiffs alleged in their amended complaint that the defendant could not use the FWW method to compute overtime for hours worked over 40 hours in a workweek under 29 C.F.R. §778.114 because the class members' salaries were not fixed, a requirement for using that method. The plaintiffs alleged this was the case based on the defendant's payment of nondiscretionary holiday and annual bonuses and different rates of pay for any snow-related activities a class member might have performed

2

("snow pay"). The plaintiffs alleged these forms of compensation were not added to the overtime calculation and should have and that these additions made the defendants usage of the FWW method improper.

On October 8, 2013, the initial named plaintiff, Jonathan Amador Acevedo ("Amador"), filed the original class action complaint in this court alleging violations of the FLSA and Pennsylvania wage and hour laws alone. (Doc. 1). On February 14, 2014, the court granted the parties' joint request to stay discovery, (Doc. 35), allowing the parties to participate in three full-day sessions of mediation in Philadelphia, Atlanta, and Los Angeles between July 2014 and February 2015 with the Honorable Joel B. Rosen (Ret.), retired Magistrate Judge for the United States District Court of the District of New Jersey, and Hunter Hughes, Esq., where the parties ultimately reached a settlement. In order to reach an agreement, the parties engaged in extensive informal discovery and the defendant voluntarily produced employee pay data. The exchange of this information led to the discovery of additional named plaintiffs and alleged violations in other states where the defendant employed supervisors.

On May 29, 2015, the named plaintiffs filed an unopposed motion to preliminarily approve their initial settlement agreement along with an amended complaint which added the additional state law claims and the five additional plaintiffs now named in this action. (Doc. 103; Doc. 104). After several

telephone conferences with the court to discuss the court's concerns with the initial settlement agreement, the plaintiffs filed a motion for preliminary approval of an amended settlement agreement, the agreement now subject to approval. (Doc. 118). On March 21, 2017, the court preliminarily approved the parties' amended agreement and class counsel and the court scheduled a final approval hearing for July 21, 2017.  (Doc. 119; Doc. 120). The court also preliminarily approved the parties' proposed settlement administrator, Dahl Administration, LLC ("Dahl"), to set in motion the process of sending notice, claim forms, objections, opt-in and opt-out forms, etc. for class members. Prior to the final hearing, on May 8, 2017, the named plaintiffs filed their current unopposed motion for attorneys' fees. (Doc. 121). Also prior to the final hearing, on July 11, 2017, the named plaintiffs formally motioned for final approval of the amended settlement agreement, submitting their briefing for the court's review. (Doc. 122).

At the final approval hearing, class counsel reiterated in detail the arguments set forth in the named plaintiffs' briefing. The defendant's counsel supported these arguments in open court without objections. The court lauded the parties for their extensive work in reaching a settlement the court deemed fair and reasonable. No objectors were present at the final hearing. Class counsel did inform the court that several class members had filed late claims that the defendant had agreed to include in the final settlement. Accordingly,

on July 28, 2017, the named plaintiffs filed a declaration from Dahl detailing the final amount of class members, the final amount to be included in the settlement, the final sum for distribution, a list of calculated settlements to be distributed to the class members following final approval, and a settlement fund summary. (Doc. 125).

## II.   THE AMENDED SETTLEMENT AGREEMENT

### A.   Classes Included in the Amended Settlement Agreement

The parties' amended settlement agreement contains two distinct settlement classes, a class dedicated to the FLSA claims, the FLSA Collective Group, and a class dedicated to the state law claims, the State Settlement Class. On February 14, 2014, the court conditionally certified the FLSA Collective Group under Section 16(b) of the FLSA, 29 U.S.C. § 216(b). (Doc. 35). The Collective Group was defined as follows:

> All current and former employees in the United States who have worked for The Brickman Group and who, at any time between October 8, 2010 and the present, were paid a salary, but only received "fluctuating workweek"- type half-time overtime pay for hours worked over 40 hours in a workweek (meaning at a rate that decreased with each overtime hour worked, rather than at time-and-a-half their hourly rate), including but not limited to salaried landscape/crew/irrigation Supervisors and those in similarly titled positions.

After preliminary approval of the class, notice with an opt-in consent form was then sent to 1,360 Collective Group members. Ultimately, 417 Collective Group members filed opt-in consent forms to the FLSA action at the start of the litigation. Now, an additional 345 members have opted in by submitting claim forms.

On March 21, 2017, the court preliminarily certified the State Settlement Class defined as follows:

> all individuals who were paid by The Brickman Group for work performed in Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia, Washington, or Wisconsin and who, at any time between October 8, 2010 and June 8, 2014, were paid a salary, but worked under a pay plan in which they were eligible to receive "fluctuating workweek"-type half-time overtime pay for hours worked over 40 in a workweek (meaning at a rate that decreased with each overtime hour worked, rather than at time-and-a-half their hourly rate), including but not limited to salaried landscape/crew/irrigation Supervisors and those in similarly titled positions.

(Doc. 120). The State Settlement Class incorporated the additional state law claims in the amended complaint.

## B. Terms of the Amended Settlement Agreement

The amended settlement divided all of the class members and named plaintiffs from the above two classes into two groups, Group 1 and Group 2. Group 1 included all FLSA Collective Group members who originally filed an opt-in form at the start of this litigation, including all the named plaintiffs, and all Collective Group members who worked in Pennsylvania, regardless of their original opt-in status. The parties estimated that there were approximately 476 Group 1 members. Group 2 included all remaining Collective Group members who did not file an opt-in form and who did not work in Pennsylvania. Group 2 was designed as a catch-all for all of those putative plaintiffs in the Collective Group who did not file an opt-in form at the start of the case, other than those who worked in Pennsylvania. The parties initially estimated that there were approximately 839 individuals in Group 2.

Dahl agreed to administer the entire settlement for these two groups for fees not to exceed $17,470.00. The parties also agreed that the named plaintiff in the original complaint, Amador, would receive a service award in the amount of $5,000.00. The remaining named plaintiffs would each receive a $1,000.00 service award. These amounts would be taken pro rata from the Group 1 and Group 2 qualified fund.[1]

---

[1] The gross fund was labeled a qualified fund after the defendant handed over the agreed upon sums to Dahl. Upon receipt of the funds, Dahl was required to satisfy all Internal Revenue Service ("IRS") regulations needed to convert the funds into a "Qualified Settlement Fund" as defined by IRS regulations.

Settlement treatment depended on inclusion within a certain group. Group 1 members were guaranteed a minimum payment without further action and would be excluded only if they expressly opted out of the settlement. The defendant agreed to pay a gross maximum of $3.25 million for Group 1 claims. After deducting class counsel attorneys' fees and costs, administrator fees and costs, and service awards, each Group 1 member was initially entitled to $150.00 as an award. After this initial set-aside award, the parties agreed that Dahl would determine how to distribute the remaining funds to Group 1 members by using a formulation that created a per dollar share, taking into account the members' actual overtime pay during weeks the member was eligible to receive FWW pay for hours worked over forty in a workweek. This calculation would be based on the defendant's payroll and timekeeping data. The remaining funds would then be divided pro rata among Group 1 members based on their per dollar share figure.

The defendant agreed to pay a gross maximum of $3.7 million for Group 2 claims, but the parties negotiated a built in limitation to this gross amount. The defendant's actual gross payment for Group 2 claims would be based on the percentage of Group 2 members who submitted a timely claim form—*i.e.*, if thirty percent of individuals in Group 2 opted in, then only thirty percent of the Group 2 maximum fund, or $1.11 million, would be the gross fund from

(Doc. 118-3, ¶28).

which a portion would be going to Group 2 members. The net fund would be determined after deducting attorneys' fees and costs, administrator fees and costs, and service awards.

Unlike Group 1 members, only Group 2 members who submitted a timely claim form would be eligible to participate in settlement. Like Group 1 members, however, eligible Group 2 members would receive a minimum $150.00 set aside from the Group 2 net fund. Dahl would then determine a per dollar share figure for eligible Group 2 members based on the defendant's previously produced payroll and timekeeping data. Dahl would then distribute the remaining funds pro rata based on the net amount in the Group 2 fund and each Group 2 member's per dollar share figure.

Also unlike the Group 1 settlement, the Group 2 settlement was subject to the defendant's unilateral option to void the agreement if more than thirty-one percent of Group 2 members became eligible to receive a payment, *i.e.,* if more than thirty-one percent of Group 2 members opted in. The void provision did not effect the settlement of Group 1 members. The defendant's decision to void the agreement was optional, not mandatory. Thus, although $3.7 million was agreed to as the maximum gross amount for Group 2 claims, this amount was limited by the amount of Group 2 members who actually opted in and, further, by the defendant's option to void the agreement with

respect to Group 2 if more than thirty-one percent of Group 2 members did opt in.

Group 1 and Group 2 members had thirty days from the initial mailing of settlement notices and claim forms to object to the settlement by providing a written statement to Dahl. The forms would be in both English and Spanish as many of the defendant's employees were Spanish-speaking. A website would also be established where members could submit a claim form via electronic signature. Those in the State Settlement Class who wished to exclude themselves from the claims based on state law were allowed to do so by providing a written statement to Dahl on or before the thirty-day deadline. Group 2 members were given sixty days to submit an executed claim form needed to receive a settlement award, thereby opting into settlement.

The parties agreed that Group 1 and Group 2 members would have their settlement award treated the same for tax purposes. Half of the award would be treated as wages, with Dahl responsible for withholding federal and state income and employment taxes. The remaining half would be treated as non-wage liquidated damages reported on an IRS Form 1099. Release language for the FLSA claims and the state law claims would be included on all settlement checks. Mailed checks would remain valid and negotiable for 180 days after issuance and would be automatically cancelled if not cashed within that time. If administratively feasible, the parties agreed that funds from

uncashed checks would be redistributed to eligible Group 1 and Group 2 members. If that was not administratively feasible, uncashed check funds would revert to a qualified settlement fund to be held by class counsel in a trust account for the applicable state statutory period for contract claims. No amount from the uncashed checks would revert to the defendant and class counsel would update the court within a year regarding the status of any unclaimed funds.

### C.  Current Administration of the Amended Settlement Agreement

After the court preliminarily approved the parties amended settlement agreement, Dahl immediately began the settlement process. Based on the defendant's records, Dahl identified 1332 unique records that identified a particular class member's name, last known address, social security number, and payroll information. (Doc. 135 ¶4). Of this list, 494 members were classified as being in Group 1 and 838 members were classified as being in Group 2. (*Id*. ¶5). On April 10, 2017, Dahl mailed notice packets in English and Spanish to all 1332 class members. (*Id*. ¶7). Dahl also established a settlement website. (*Id*. ¶8). Of the 1332 notices mailed, only 54 were returned as undeliverable. (*Id*. ¶9). Dahl found updated addresses for eleven of these individuals and remailed packets to those updated addresses, with none

returned as undeliverable. (*Id*. ¶¶9–10). The remaining 43 packets could not be redelivered, resulting in a non-deliverable rate of only 3.2%. (*See id*.).

Dahl did not receive any objections to the settlement and, as the court noted at the hearing, no objectors attended the final hearing. (*Id*. ¶12). Dahl did not receive any requests for exclusion from any group members. (*Id*. ¶11). Out of the 838 Group 2 members, 345 of these members submitted opt-in forms, though eight of these forms were untimely. (*Id*. ¶13). The defendant agreed to accept these untimely claim forms as part of the settlement, bringing the final opt-in rate for Group 2 members to 41.16%. (*Id*.). Based on the information gathered during administration, the average estimated, net settlement award will be $4,153.72 for Group 1 members and $2,769.61 for eligible Group 2 members who opted-in. (*Id*. ¶24). This average, of course, does not take into account the great variation amongst the members based on their individualized per dollar share figure. (*See id*. at Exs. B–C (listing the estimated individual settlement award calculations for all members)). The maximum estimated award for Group 1 members is $25,062.86 and $19,388.46 for Group 2 members. (*Id*. ¶24).

Although the percentage of opt-in forms from Group 2 members triggered the defendant's unilateral option to void the settlement with respect to Group 2, on June 22, 2017, the defendant advised Dahl that it would not elect to exercise that provision. (*Id*. ¶21). Even after being advised of several

12

more late filings at the final hearing, the defendant's counsel advised the court that the defendant would continue with the settlement and would not exercise the void provision. Thus, many of the court's reservations with respect to the void provision, reservations that the court expressed to the parties on multiple occasions, did not come to fruition. Dahl's administrative fees and costs for its work to date totals $15,882.00, less than the $17,470.00 maximum the parties agreed to.

## III.    FINAL CERTIFICATION OF THE SETTLEMENT CLASSES

This action is a hybrid FLSA and state law action. Due to the hybrid nature of the action, the court must grant final certification of the opt-in FLSA Collective Group under Section 16(b) of the FLSA, 29 U.S.C. § 216(b) for settlement purposes. The court must also grant final certification to the State Settlement Class under Federal Rule of Civil Procedure 23. The analytical inquiries for these two types of class actions are distinct with some overlap. The court finds that final certification is warranted with respect to both the FLSA Collective Group and the State Settlement Class.

### A.    The State Settlement Class

Rule 23(a) requires that four threshold requirements be met in order for a Rule 23 class to be certified: numerosity, commonality, typicality, and

adequate representation. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613 (1997); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 527 (3d Cir. 2004). In addition, the class must satisfy one of the requirements of Rule 23(b). Here, the plaintiffs seek final certification under Rule 23(b)(3) which permits a court to certify a class in cases where "questions of law or fact common to class members predominate over any questions affecting individual members" and the "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These two requirements are commonly referred to as predominance and superiority. *See, e.g., In re Constar Int'l, Inc. Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009). A party that seeks to certify a settlement class must satisfy the same requirements necessary to maintain a litigation class. *In re Gen. Motors*, 55 F.3d at 778. However, the fact that the parties have reached an agreement and the terms of that agreement may factor into the certification analysis. *See Amchem Prods.*, 521 U.S. at 619.

The court finds that each of the above requirements are met in this case. Specifically, Rule 23(a)(1) requires that a class be so numerous that joinder of all members is impracticable. Classes exceeding forty or more class members are generally held to meet the numerosity requirement. *See Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001). In addition, the court may consider the geographic dispersion of the members. *Bredbenner v. Liberty*

*Travel, Inc.*, Nos. 09-905 (MF), 09-1248 (MF), 09-4587 (MF), 2011 WL 1344745, at *5 (D.N.J. April 8, 2011).

The instant settlement class consists of 1332 persons, 494 are automatically included in settlement by virtue of their inclusion in Group 1 and another 345 members from the Group 2 pool are included as these members have submitted valid claim forms. These class m

embers are found across the country. The large amount of class members and the geographic dispersion of the members would make joinder impracticable. Accordingly, the plaintiffs satisfy the numerosity requirement.

Rule 23(a)(2) requires that there are questions of law or fact common to the class. If class members share at least one question of law or fact in common, factual differences among the claims of the class members do not defeat certification. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 310 (3d Cir. 1998). Here, the class members share a common claim of alleged violations of state law based on the defendant's usage of the half-time FWW method for overtime compensation that did not include (and despite) payment of holiday bonuses, annual bonuses, and snow pay. *Cf. Rivet v. Office Depot*, 207 F. Supp. 3d 417, 429 (D.N.J. 2016) (finding commonality was satisfied in a hybrid FLSA/state settlement class under Rule 23 where state claims under four state regimes were based on the defendant's usage of the FWW method). The class claims will involve

common factual issues regarding: (1) entitlement to additional overtime compensation; and (2) whether the defendant's pay practices violated state wage and hour laws. "Courts regularly find commonality in similar wage and hour suits in which class certification is sought." *Bredbenner*, 2011 WL 1344745, at *6 (collecting cases). Thus, the second prerequisite is met in this case.

Rule 23(a)(3) and Rule 23(a)(4) require that the claims or defenses of the representative be typical of the claims or defenses of the class and that the representative will fairly and adequately protect the interests of the class. These two inquiries tend to merge because both evaluate the relation of the claims and the potential conflicts between the class representative and the class in general. *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006). Typicality focuses on whether the interests of the class representative aligns with the interests of the absent class members such that the representative is working towards the benefit of the class as a whole. *In re Prudential*, 148 F.3d at 311. Three considerations are relevant to this inquiry: (1) whether the claims of the class representative are generally the same as the class in terms of the legal theory advanced and the facts; (2) whether the class representative is entitled to a defense not applicable to the class and is likely to be a focus of litigation; and (3) whether the interests and incentives of the class representative align with the rest of the class. *In re Schering Plough*

16

*Corp., ERISA Litig.,* 589 F.3d 585, 599 (3d Cir. 2009). The claims and facts do not need to be identical, but there must be strong similarity. *Bredbenner*, 2011 WL 1344745, at \*7. Adequacy is comprised of two inquiries. *Id*. (citing *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975)). The first inquiry looks to whether any significant antagonistic interests or conflicts exist between the class representative and absent members. *Id*. The second inquiry looks to the experience and expertise of class counsel in representing the class. *Id*.

In this case, the named plaintiffs' claims are typical of those held by the class members as they are based on the same facts and the same legal theories. All named plaintiffs were supervisory employees who worked for the defendant in various locations across the country and received annual bonuses, holiday bonuses, and/or snow pay but were paid using a half-time FWW method of overtime compensation. There is no defense unique to the named plaintiffs and their interests directly align with the members of the State Settlement Class. The named plaintiffs also satisfy the adequacy requirement. The named plaintiffs hold no interests that are antagonistic of the class members' interests, thus making them adequate class representatives. Moreover, the class is represented by counsel who have experience and success with collective and hybrid FLSA/Rule 23 class action litigation, an

inquiry that the court detailed in its preliminary approval of the amended agreement.

The court also finds that the action meets the predominance and superiority requirements of Rule 23(b)(3). Rule 23(b)(3) allows certification of a class if the questions of law or fact common to class members predominate over any questions affecting only individual members and if a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Predominance merges with the concept of commonality, but has a more exacting standard. *Bredbenner*, 2011 WL 1344745, at *8. The court may consider four non-exhaustive factors listed in Rule 23(b)(3) to determine whether superiority is met. Fed. R. Civ. P. 23(b)(3)(A)–(D). These include the following:

(1)    The class members' interest in individually controlling the prosecution or defense of separate actions;

(2)    The extent and nature of any litigation concerning the controversy already begun by or against class members;

(3)    The desirability or undesirability of concentrating the litigation of the claims in the a particular forum; and

(4)    The likely difficulties in managing a class action.

*Id*. Management problems, however, are not applicable when certifying a settlement class. *In re Warfarin*, 391 F.3d at 529. Ultimately, the court should attempt to "balance, in terms of fairness and efficiency, the merits of the class action against those of alternative available methods of adjudication."

18

*Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996) (internal quotation marks and citation omitted).

Here, the common factual and legal questions applicable to the class members predominate over any individual claims. The class claims are based upon a common course of alleged conduct, particularly, the defendant's pay policies and its usage of the FWW method for overtime compensation. Similarly, class adjudication is the superior method of adjudication. Given the lack of objections or exclusions, there appears to be no class member with a controlling interest in the litigation. There are no other actions overlapping with the current one. Given the defendant's locations across the country with employees across various states, a singular action would enhance recovery. Moreover, the claims are fully matured as the defendant changed its method of overtime compensation in June of 2014 as a result of this action. *Cf. Bredbenner*, 2011 WL 1344745, at *9 (finding that the full maturation of the claims weighed in favor of finding superiority).

Further, when certifying a settlement class, variations in state law do not present an insurmountable obstacle to final certification because the court is not concerned with the manageability of claims from a litigation perspective. *In re Warfarin*, 391 F.3d at 529; *see also Bredbenner*, 2011 WL 1344745, at *9 (same). These issues are irrelevant when certifying a settlement only class. *Id*.; *id*. Thus, the court finds that the predominance and superiority

requirements of Rule 23(b)(3) are met for the State Settlement Class. Accordingly, the court will grant final certification to this class for settlement purposes.

## B.    The FLSA Collective Group

The court will also grant final certification to the FLSA Collective Group for settlement purposes. This class will include all Group 1 members[2] and all Group 2 members who submitted claim forms for settlement purposes. Courts employ a two-step process for approving FLSA classes, an initial "conditional" certification and a later "reconsideration" phase. *Bredbenner,* 2011 WL 1344745, at *16 n. 4. The court has already granted conditional certification of the Collective Group, (Doc. 35), and need only reconsider that decision in finally certifying the class for settlement purposes.

To certify a FLSA collective action the court must find that the employees in the class are "similarly situated" within the meaning of the FLSA. *Bredbenner*, 2011 WL 1344745, at *17 (citing *Sperling v. Hoffman-La Roche, Inc.*, 862 F.2d 439, 444 (3d Cir. 1888), *aff'd*, 439 U.S. 165 (1989)). The Third Circuit Court of Appeals has endorsed the balancing of various factors set forth in *Plummer v. General Electric Co.*, 93 F.R.D. 311 (E.D. Pa. 1981) and

---

[2] Group 1 members who did not opt-in originally but are included in Group 1 based on their Pennsylvania claims will, in essence, opt in by cashing their settlement award.

*Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987) to make this finding. *Id*. (citing *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43 (3d Cir. 1989) and *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 388 n. 17 (3d Cir. 2007)). The *Lusardi* factors are typically used in granting final FLSA certification and they include: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to [defendants] which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." *Id*. (quoting *Lusardi*, 118 F.R.D. at 359) (alterations in original). These factors are "neither exhaustive nor mandatory." *Id*. Moreover, where the FLSA class is joined with a Rule 23 class, the FLSA class inquiry largely overlaps with the Rule 23 analysis. *Id*. In these instances, the court agrees that it "need only address the *Lusardi* factors in passing." *Id*. In addition, the concern with individualized inquiries speaks directly to case management issues which is not at issue when certifying a class for settlement purposes only. *Id*. (citing *Amchem*, 521 U.S. at 620).

The court has already found that the employees should be certified for Rule 23 settlement purposes and the court now finds that the FLSA Collective Group members continue to be similarly situated, warranting final certification of the FLSA Collective Group. They are all non-exempt supervisory employees who were paid under the FLSA's half-time FWW method of overtime compensation between October 8, 2010 and June 8, 2014. The

named plaintiffs are representative of employees in this category. The alleged harm is based on payments of holiday bonuses, annual bonuses, and snow pay not included in the FWW method. Thus, the court finds that the employees in the Collective Group and their claims are factually similar and not disparate.

With respect to individualized defenses, the named plaintiffs did advise the court in their motion for attorneys' fees that the defendant's planned to seek decertification based on individualized defenses. (Doc. 121-1 at 19–20). In particular, the defendant's planned to assert an exemption defense for those supervisory employees who drove trucks with trailers that exceeded a combined 10,000 pounds in weight. Class counsel was then prepared to argue a "mixed-fleet" exception to this exemption based on Third Circuit precedent and federal statutory law. (*Id*. at 20 (citing *McMaster v. Eastern Armored Servs.*, 780 F.3d 167 (3d Cir. 2015)). This would present a defense that might be individualized. Either a particular plaintiff did or didn't drive trucks with trailers over 10,000 pounds and, if a particular plaintiff did drive trucks with trailers over 10,000 pounds, the court would need to determine if any percentage of time was spent driving trucks with trailers under 10,000 pounds. This inquiry, however, would speak directly to case management problems, problems that have little weight in the settlement context. Moreover, it is not obvious that this defense would predominate and present an

insurmountable obstacle to certification. Accordingly, the court will finally certify the FLSA Collective Group for settlement purposes.

## IV.    FINAL APPROVAL OF THE AMENDED SETTLEMENT AGREEMENT

### A.    Rule 23 Final Settlement Approval

In order to approve a Rule 23 class settlement, the court must find that the settlement is fair, reasonable, and adequate and in the best interests of the class under Rule 23(e). *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 258 (3d Cir. 2009); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995). In considering a Rule 23 class action settlement, the court "plays the important role of protector of the [absent class members'] interests, in a sort of fiduciary capacity." *In re Gen. Motors*, 55 F.3d at 786. "Before sending notice of the settlement to the class, the court will usually approve the settlement preliminarily. This preliminary determination establishes an initial presumption of fairness when the court finds that: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *Id*. at 785-86 (citations omitted). "This presumption may attach even where, as here, settlement negotiations precede class certification." *Bredbenner*, 2011 WL 1344745, at *10.

Here, the court has already preliminarily approved the parties amended settlement agreement and found that the first three factors weighed in favor of that preliminary approval. (Doc. 119; Doc. 120). Now that notices have been sent to class members in Group 1 and Group 2, the court can address the fourth factor, the amount of objectors. Here, there have been no objections, further emphasizing the presumptive fairness of the parties amended settlement agreement.

In *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), the Third Circuit set forth specific factors that the court should consider in determining whether a settlement is fair, reasonable, and adequate. These factors include the following:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) stage of the proceedings and the amount of discovery completed; (4) risks of establishing liability; (5) risks of establishing damages; (6) risk of maintaining the class action through the trial; (7) ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh*, 521 F.2d at 157. "The proponents of the settlement bear the burden of proving that these factors weigh in favor of approval." *In re Gen. Motors*, 55 F.3d at 785-86 (citations omitted). "The findings required by the *Girsh* test are factual, which will be upheld unless they are clearly erroneous." *Id*.

24

The first *Girsh* factor, the complexity, expense and likely duration of the litigation, favors final approval in this case. While the court cannot state that a hybrid FLSA claim is somehow unique, the existence of state law claims under twenty-seven state regimes joined with the FLSA action does make this case relatively complex. Some of these states (including, Florida, Georgia, South Caroline, Texas, and Virginia) do not have statutory wage and hour laws and the state law claims in those instances would be based on a common law theory of unjust enrichment alone. Each state regime has a distinct statute of limitations period, which at this late stage has likely run because the defendant changed its practice of using a FWW method of computing overtime in June of 2014.

In addition, the parties decided to distinguish the Pennsylvania state law claims from the claims under the remaining twenty-six states and the court required the parties to justify this distinction. Adding to the complexity, the plaintiffs explained the strong viability of the Pennsylvania claims under the Pennsylvania Minimum Wage Act ("PMWA"), 43 Pa. Stat. §333.101, *et seq*. These claims, in addition to unjust enrichment claims under Pennsylvania law, were included in the original class action complaint and are, therefore, tolled even if settlement is denied. It is also clearer under the PMWA that the defendant's previous method of computing overtime was improper in all circumstances. *See, e.g., Verderame v. RadioShack Corp*., 31 F. Supp. 3d 702, 709 (E.D. Pa. 2014) (holding that the FWW method of computing overtime

is impermissible under the plain language of 34 Pa. Admin. Code §231.43(d)(3), an implementing regulation of the PMWA).

In comparison, many of the state statutory regimes likely follow the FLSA standards for overtime pay. The appropriateness of the defendant's actions under the FLSA is less clear. The U.S. Department of Labor ("DOL") has interpreted the FLSA to allow a FWW method of calculating overtime pay at a half-time rate where there is "fixed amount" per week and a "clear mutual understanding that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period." 29 C.F.R. §778.114.[3] The current action is based on the theory that the defendant could not use the half-time, FWW method because the class members' salaries were not fixed. The plaintiffs believed this to be the case based on the defendant's payment of nondiscretionary holiday and annual bonuses and snow pay. The plaintiffs alleged these added payment were not added to the overtime calculation and should have and that these additions made the defendants usage of the FWW method improper.

The ability of the plaintiffs to recover under the FLSA using the above theory presents an issue that has not been directly addressed by the Supreme

---

[3] *See Mozingo v. Oil States Energy Servs.*, LLC, No. 16-529, 2017 WL 3219345, at *2 (W.D. Pa. July 28, 2017) (explaining that respect under *Skidmore v. Swift*, 323 U.S. 134 (1944) is due to an agency's informal interpretations of an act only to the extent that interpretation has the power to persuade).

Court or the Third Circuit. The trend appears to be that courts distinguish between performance-based and time-based bonuses with only time-based bonuses violating the "fixed salary" requirement needed to use the FWW method. *See, e.g., Mozingo*, 2017 WL 3219345, at *3 (concluding that only time-based compensation would violate the fixed salary requirement); *Lalli v. Gen. Nutrition Ctrs., Inc.*, 814 F.3d 1, 4–6 (1st Cir. 2016) (same); *Wills v. RadioShack Corp.*, 981 F. Supp. 2d 245, 256–58 (S.D.N.Y. 2013) (same) (collecting cases) (finding that this interpretation was consistent with the Supreme Court's interpretation of the FLSA in *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572 (1942), partially superceded by statute as stated in *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 n. 22 (1985)).

Here, the alleged violations are based on holiday bonuses, annual bonuses, and snow pay. Had the court been required to weigh in on this issue and followed the apparent trend, it is possible that not all of the violations would have been deemed a violation of the FWW method, though this case law is still developing. The distinctions between the types of additional compensation and the fact that the court would need to weigh in on an unsettled issues would naturally make litigation more complex. These considerations would also likely lead to higher expenses if the plaintiffs were required to litigate their claims to trial and a lengthier litigation timeline overall. Thus, the first *Girsh* factor weighs in favor of approval of the parties' amended settlement agreement.

The second *Girsh* factor, the reaction of the class to settlement, undoubtably favors settlement. There were no objections to the class and no requests for exclusion from the State Settlement Class. (Doc. 125 ¶¶11–12). No objectors attended the final hearing on July 21, 2017, as the court noted on the record. Out of the 1332 class members, 494 Group 1 members will be participating in the settlement, the full amount of Group 1 members, and 345 Group 2 members will be participating. The reaction of Group 2 members went beyond even the parties' expectations. Approximately 41.16% of Group 2 members will be participating in settlement, above the anticipated thirty-one percent the parties negotiated as part of the void provision. Ultimately, 839 class members, out of a total of 1332 class members, have affirmatively participated in the parties' settlement, approximately sixty-three percent of the class members. The court views this as an excellent result.

The third *Girsh* factor also favors final approval, the stage of the proceedings and the amount of discovery completed. The court stayed discovery in the action early on to allow the parties to engage in mediation. (Doc. 35). At that point the defendant had already answered the original complaint in this action. (Doc. 21). The parties did not engage in any formal motions practice and the defendant has not answered the amended complaint, which was filed on a stipulated basis contingent on the success of settlement.

Although the parties did not engage in formal discovery, during the mediation process there was sufficient exchange of information and class

28

counsel uncovered violations in other states across the country. In particular, the parties exchanged the following:

(\

1)    [A]n electronic spreadsheet setting forth the dates of employment in which putative class members worked in the position at issue;

(2)    Employee Earnings Detail history Reports and weekly pay data for each calendar year in which an employee worked in the position at issue during the applicable time period;

(3)    [A]ll documents summarizing or describing the policies and procedures for compensating putative class members in the form of wages, bonuses, overtime compensation, and all other forms of compensation during the applicable period;

(4)    [P]olicies or practices applicable to putative class members with respect to time-keeping and compensation;

(5)    [J]ob descriptions for the putative class members;

(6)    Department of Labor audit, evaluations, and reports; and

(7)    [A] sample of personnel files.

This documentation was required in order to arrive at damages calculations, calculations that the parties disputed during mediation. Thus, the court finds that the second *Girsh* factor favors settlement given the sufficiency of informal discovery and the amount of time spent by the parties attempting to reach a settlement.

The fourth, fifth, and sixth *Girsh* factors also strongly favor final approval of the parties' amended settlement agreement. These factors speak to the risks the class would face with respect to establishing liability, establishing

damages, and maintaining the class action if litigation were to continue. Here, these risks are high. The court has discussed in detail the risks of establishing liability in its analysis of the first *Girsh* factor. Some potential liability issues would include: (1) varying statutes of limitations; (2) finding liability in states without statutory protection where a class member's sole claim would be for unjust enrichment; and (3) finding liability for all the defendant's practices with respect to holiday pay, annual pay, and snow pay in states with statutes that closely track the FLSA FWW method.

In addition, given their disagreement with respect to liability, the parties naturally disagreed over proper damage calculations. The parties disagreed over the appropriate amount of damages for settlement purposes even after exchanging employee records, including time-keeping records. As detailed in a letter brief to the court, (Doc. 113), the parties used both a conservative damage model favorable to the defendant and a damage model favorable to the plaintiffs to arrive at the gross sum for Group 1 and Group 2. (*Id*. at 2–3). These models attempted to take into account the attendant risks of establishing liability.

The two damages estimates for Group 1 members were $1,030,842.00 and $4,377,660.00.  (*Id*. at 2) The resulting $3,250,00.00 set aside for Group 1 is, on its face, a compromise between these damages estimations. Group 2 members, those with only state law claims at that point in time because they

had not opted into the FLSA class, faced higher risks.[4] (*Id*. at 3 n. 2). The two damages estimates for Group 2 members were $224,540.00 and $7,287,983.00. (*Id*. at 3). The parties' divergent views on the ability to establish liability for Group 2 members is clearly seen in the difference between those two numbers. Like the final Group 1 amount, the $3,700,000.00 gross amount set aside for these claims is a clear compromise over these divergent views. The void provision and the defendant's ability to walk away from the Group 2 settlement if more than thirty-one percent of Group 2 members opted in was an added layer of protection for the defendant from these weaker claims. If the plaintiffs were required to continue litigating this case, and particularly the Group 2 claims, the risks of establishing damages would be inextricably tied to the risks of establishing liability.

In addition, the plaintiffs face serious risks of trying to maintain the Rule 23 State Settlement Class. Here, the State Settlement Class consists of claims under twenty-seven state law regimes, some of which do not have statutory wage and hour protection. While the heart of this action is the FLSA action, if faced with managing litigation the court would be wary of certifying such a sprawling class. In the briefing to the court for the motion for attorneys' fees, the named plaintiffs explained that the defendants planned to oppose

---

[4] Group 2 did not include Pennsylvania law claims but these claims faced little to no risk because these claims had no statute of limitations issues. These claims were tolled by the original complaint filing. Further, the defendant's actions were clearly improper under Pennsylvania law.

certification of the Rule 23 class and planned to motion to decertify the FLSA class based on individuals defenses to the class claims. (Doc. 121-1 at 14–15). Accordingly, the court finds that the class claims bore substantial liability, damages, and class certification risks. These risks were assessed and weighed in the damages calculations and the resulting settlement as seen by the gross amounts set aside for Group 1 and Group 2 and the void provision. As such, the *Girsh* risk factors weigh in favor of final approval.

The eight *Girsh* factor also weighs in favor of final approval, the ability of the defendants to withstand a greater judgment. Here, the parties negotiated a gross settlement amount of $6,950,000.00—$3,250,000.00 for Group 1 and $3,700,000.00 for Group 2. The actual gross amount, now that Group 2 members have had an opportunity to opt-in will be $4,773,269.69— $3,250,000.00 for Group 1 and $1,523,269.69 for Group 2—less than the agreed upon gross amount. (Doc. 125, Ex. A). Thus, in theory the defendant could withstand a greater judgment. However, although the gross amount set aside was $6,950,000.00, the gross amount set aside before the defendant's unilateral option to void the Group 2 settlement could be exercised was $4,397,000.00.[5] The fact that the defendant chose not to exercise that option when the opt-in rate for Group 2 reached 41.16% means that the defendant

---

[5] The parties' void provision anticipated a thirty-one percent opt-in rate for Group 2 members lowering the anticipated Group 2 gross total to $1,147,000.00. When added to the $3,250,000.00 set aside for Group 1 the final estimated gross amount was $4,397,000.00.

will be withstanding a greater financial burden than it originally anticipated. The court cannot state with any certainty that the defendant could somehow withstand more, even if financially able, given the risks of litigation, the resulting compromise, and the defendant's later decision to compromise even after more Group 2 members opted in than were originally anticipated. Accordingly, this factor weighs in favor of approval.

The eight and ninth *Girsh* factors, the ranges of reasonableness of the settlement fund in light of the best possible recovery (with and without consideration of attendant risks), clearly favor final approval. The court has explained the damages models used by the parties to reach a final sum, with one model more favorable to the plaintiffs and the other more favorable to the defendant. For Group 1 members these calculations amounted to $1,030,842.00 and $4,377,660.00. For Group 2 members these calculations amounted to $224,540.00 and $7,287,983.00. Thus, the range was between $1,255,382.00 and $11,665,643.00. The gross amount of $6,950,000.00 set aside for Group 1 and Group 2 is a near exact compromise over the parties' damages calculations. While the actual gross amount will be lower, $4,773,269.69 to be exact, the court finds this amount to be reasonable. It amounts to approximately 40% of the damages model most favorable to the plaintiff and approximately 380% of the damages model most favorable to the defendant, almost four times more than those calculations. Moreover, the final amount is a near perfect compromise over the claims when viewed in light of

the many risks of establishing liability and maintaining class claims at this stage of the litigation. It is more than what the defendant anticipated paying while still below the most favorable damages calculation for the class. Because of this the court finds that the final two *Girsh* factors clearly favor approving the settlement in this case. Thus, all of the *Girsh* factors favor approval. Accordingly, the Rule 23 settlement will be finally approved.

### B.    FLSA Final Settlement Approval

The standard for final approval under the FLSA is distinct but intertwined with the court's *Girsh* analysis above. Under the FLSA, "[o]nce employees present a proposed settlement agreement to the district court pursuant to Section 216(b), the [c]ourt may enter a stipulated judgment if it determines that the compromise 'is a fair and reasonable resolution of a bona fide dispute over FLSA provisions.'" *Brown v. TrueBlue, Inc.*, No. 1:10-cv-00514, 2013 WL 5408575, *1 (M.D. Pa. Sept. 25, 2013) (citing *Cuttic v. Crozer–Chester Med. Ctr.*, 868 F. Supp. 2d 464, 466 (E.D. Pa. 2012); *see also Adams v. Bayview Asset Mgmt., LLC,* 11 F. Supp.3 d 474, 476 (E.D. Pa. 2014) (DOL supervision or court approval are the "only two ways that FLSA claims can be settled or compromised by employees," "[b]ecause of the public interest in FLSA rights"). The role of the court in FLSA class actions is distinct because, unlike its role in Rule 23 actions to serve as caretaker and protect absent class members, the court in FLSA class actions serves as gatekeeper to "ensure[] that the

parties are not 'negotiating around the clear FLSA requirements' via settlement." *Bredbenner*, 2011 WL 1344745, at *18 (quoting *Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 720 (E.D. La. 2008)). There are no absent class members in an FLSA opt-in class.

The Third Circuit has not specifically addressed the factors that the district court should consider when approving FLSA settlements. However, district courts within this circuit have followed the Eleventh Circuit's decision in *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1354 (11th Cir.1982). *See, e.g., Kraus v. PA Fit II*, 155 F. Supp. 3d 516, 521 (E.D. Pa. 2016) (court applied the *Lynn's Food* standard); *Brown*, 2013 WL 5408575, *1 (same). Under this standard, "[w]hen parties present to the district court a proposed settlement, the district court may enter a stipulated judgment if it determines that the compromise reached 'is a fair and reasonable resolution of a bona fide dispute over FLSA provisions.'" *Cuttic*, 868 F. Supp. 2d at 466 (quoting *Lynn's Food*, 679 F.2d at 1354). Thus, application of the *Lynn's Food* standard for approval is a two part inquiry: (1) is the settlement fair and reasonable and (2) does it resolve a bona fide dispute. Lastly, the court should "proceed to determine whether [the settlement] furthers or frustrates the implementation of the FLSA." *Brown*, 2013 WL 5408575, *1

To determine whether an FLSA settlement agreement is fair and reasonable, "district courts have relied on the factors set out by the Third Circuit for approving class action settlements pursuant to Federal Rule of Civil

Procedure 23." *Id*. at *2. Thus, the *Girsh* factors set forth by the Third Circuit apply. The court has already concluded that all of the *Girsh* factors favor settlement in this case.

The court also finds that the parties amended settlement agreement resolves a bona fide dispute. A dispute is bona fide if it involves "factual issues rather than legal issues such as the statute's coverage and applicability and when its settlement reflects a reasonable compromise of disputed issues rather than a mere waiver of statutory rights brought about by an employer's overreaching." *Creed v. Benco Dental Supply Co.*, No. 3:12-CV-01571, 2013 WL 5276109, at *1 (M.D.Pa. Sept. 17, 2013) (internal citations and quotation marks omitted). A bona fide dispute under the FLSA includes computation of backwages and compensation due. *Bredbenner*, 2011 WL 1344745, at *18. Similarly, issues over the proper calculation of overtime under the FWW method present a bona fide dispute. *Id*. Here, the parties' dispute revolves around the proper computation of overtime pay and whether or not the FWW method was available to the defendant. *Cf*. *id*. (concluding that whether or not an employer's FWW formula was proper under the FLSA presented a bona fide dispute).

The issues presented in this case present a bona fide dispute over the back wages and overtime compensation. The defendant's actions in reaching settlement cannot be described as overreaching but an utmost compromise. In reaching settlement the defendant's have allowed FLSA class members to

join the FLSA Collective Group well after the original time for opting in, giving these class members (Group 2) another opportunity to be compensated for wrongs that may or may not be compensable given the developing state of FLSA law on the issue of FWW overtime pay.

Finally, the court finds that the parties' amended settlement agreement furthers the FLSA. "In 1938, Congress enacted the FLSA to protect covered workers from substandard wages and oppressive working hours." *Friedrich v. U.S. Computer Servs.*, 974 F.2d 409, 412 (3d Cir. 1992) (citing *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981). The FLSA provides that:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. §207(a)(1). Thus, employers covered by the FLSA must pay overtime compensation to employees who work for more than forty hours a week "unless one or another of certain exemptions applies." *Packard v. Pittsburgh Transp. Co.*, 418 F.3d 246, 250 (3d Cir. 2005). In this case, the defendant used the half-time FWW method instead of the one and one-half time method, which is an FLSA compliant method of overtime compensation

under 29 C.F.R. §778.114 in certain circumstances. If this method was not appropriate, however, the one and one-half method was required.

The resulting settlement compensates the FLSA Collective Group for the defendant's potential wrongdoing while taking into account the attendant risks of further litigation. The amount received by class members will reflect a pro rata share of the sum of money set aside for claims. This share figure is based on actual time-keeping records of hours worked on an individualized basis. Moreover, the defendant changed its method of computing overtime compensation in June of 2014. Thus, not only will those in the FLSA class be fairly compensated for any potential wrongdoing, employees hired after the defendant's change in pay practices will likely benefit from this action. Thus, the benefits reach beyond the settlement itself. This result clearly furthers the purpose of the FLSA to protect workers and ensure they are paid appropriately. Accordingly, the parties amended settlement agreement will be finally approved with respect to the Collective Group's FLSA claims.

### C.    Final Approval of Dahl and the Service Awards

The court will also finally approve Dahl as settlement administrator. The court is aware of no issues with the handling of the settlement. The 3.2% non-deliverable rate for the mailing of notices is noteworthy. The documents submitted by Dahl are clear and concise and allow the court to fully evaluate the settlement distribution. The parties agreed to administration costs not to

exceed $17,470.00. Dahl's costs total $15,882.00, less than the amount agreed to. (Doc. 122-3 at 7). Accordingly, Dahl will be finally approved as settlement administrator.

The named plaintiffs also seek final approval of their service awards. "[C]ourts routinely approve incentive awards to compensate named plaintiffs for services they provided and the risks they incurred during the course of the class action litigation." *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145 (E.D. Pa. 2000) (quoting *In re S. Ohio Corr. Facility*, 175 F.R.D. 270, 272 (S.D. Ohio 1997)). They also reward the named plaintiff for the "public service that they performed by contributing to the enforcement of mandatory laws." *Keller v. TD Bank, N.A.*, No. 12-5054, 2014 WL 5591033, at *16 (E.D. Pa. Nov. 4, 2014).

Here, the named plaintiffs seek $5,000.00 for Amador and $1,000.00 for the remaining five plaintiffs who were added to the amended complaint. These awards will total $10,000.00 and will be taken from the common fund. The $10,000.00 amount is less than one percent of the total claimed settlement fund. The court finds that the amount request is justified and in line with awards in this circuit. This is well within the range of acceptable amounts for service awards. *See, e.g., Sakalas v. Wilkes Barre Hosp. Co.*, No. 3:11-cv-0546, 2014 WL 1871919, at *5 (M.D. Pa. May 8, 2014) (awarding service award that amounted to 1.57% of the settlement fund and describing this

amount as within the "mainstream for class action service awards in the Third Circuit").

Further, class counsel attested to the fact that the named plaintiffs provided background and employment information for the class claims and provided information about the defendant's pay policies and practices. (Doc. 118-4 ¶14). They also risked their reputation in coming forward to participate in the classes. (*Id*.). They performed a public service in bringing the defendant's pay practices to light. The defendant changed its practices in June of 2014, leading to benefits for even those employees who are not included as class members. Though Amador will be receiving a higher amount, this higher is justified given his length of time as a named plaintiff in this action and the strength of his Pennsylvania state law claim. Accordingly, the court will finally approve the $10,000.00 amount in service awards to reward the named plaintiffs for their contribution to this action.

## V.    ATTORNEYS' FEES AND COSTS

The court will also approve the requested attorneys' fees and costs for class counsel. Originally, the parties agreed that class counsel would receive attorneys' fees in an amount not to exceed one-third (33.3$\overline{3}$%) of the Group 1 gross settlement amount from the Group 1 qualified fund, with a maximum amount of $1,083,333.33. Class counsel would also receive no more than one-third of the Group 2 calculated gross settlement fund from the Group 2

qualified fund, which was to be determined based on the amount of Group 2 members who opted in and became eligible to participate in settlement. Lastly, the parties agreed that class counsel would receive reimbursement of their out-of-pocket costs approved by the court in an amount not to exceed $65,000.00, which would be paid pro rata from the Group 1 and Group 2 qualified funds.

After discussions with the court regarding the percentage amount set aside for attorneys' fees, class counsel agreed to lower that amount. Currently, the named plaintiffs' request attorneys' fees in the amount of 31.6667% of the Group 1 fund and the claimed amounts from the Group 2 fund, which will result in reallocation and correspondingly higher payments to the settlement participants. This percentage amount is used in the settlement fund summary provided by Dahl. (Doc. 125 Ex. A). The final amount requested in fees, based on sums in Dahl's Settlement Fund Summary, is $1,511,536.99.[6] The named plaintiffs have also requested $48,950.62 to reimburse class counsel's out-of-pocket costs, less than the $65,000.00 maximum agreed to by the parties. The court will approve the parties agreed upon percentage-of-recovery fee amount for class counsel and allow for full reimbursement of costs.

---

[6] The Settlement Fund Summary estimates that the final sum for Group 2 claims totals $1,523,269.69 leaving the amount of attorneys' fees taken from the Group 2 settlement at $482,369.24 ($1,523,269.69 x .316667). The amount of attorneys' fees taken from Group 1 is $1,029,167.75 ($3,250,000.00 x .316667). The final sum for attorneys' fees will therefore be $1,511,536.99 ($482,369.24 + $1,029,167.75).

## A.    Legal Standard

The FLSA provides that the court "shall, in addition to any judgment awarded to the plaintiff . . . allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. §216(b). Under Third Circuit law, a court may evaluate the award of attorneys' fees through two established methods: (1) the lodestar approach; and (2) the percentage of recovery approach. *In re Diet Drugs Prod. Liab. Litig.*, 582 F.3d 524, 540 (3d Cir. 2009). "Under the lodestar approach, a court determines the reasonable number of hours expended on the litigation multiplied by a reasonable hourly rate." *Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d 300, 310 (3d Cir. 2008). Under the percentage of recovery method, the court awards counsel a percentage of the total class recovery and uses a seven-factor test set forth in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n. 1 (3d Cir. 2000) to approve that percentage. *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 188 (3d Cir. 2005) ("*Cendant II*").

The percentage of recovery method is generally preferred under the common fund doctrine. *Keller*, 2014 WL 5591033, at *14 (citing *In re Prudential*, 148 F.3d at 333). Under the common fund doctrine, "a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *Cendant II*, 404 F.3d at 187 (quoting *In re Gen. Motors*, 55 F.3d at 820 n. 20). "Further, the

percentage of recovery method is the prevailing methodology used by courts in the Third Circuit for wage and hour cases." *Keller*, 2014 WL 5591033, at \*14; *see also DiClemente v. Adams Outdoor Adver., Inc.*, No. 3:15-0596, 2016 WL 3654462, \*4 (M.D. Pa. July 8, 2016) (same). "[C]ourts have approved attorneys' fees in FLSA [collective and class action] settlement agreements 'from roughly 20-45%' of the settlement fund."" *Kraus*, 155 F. Supp. 3d at 534 (quoting *Mabry v. Hildebrant*, No. 14-5525, 2015 WL 5025810, at \*4 (E.D. Pa. Aug. 24, 2014) (collecting cases)).

The *Gunter* factors the court considers under the percentage-of-recovery method to evaluate an award of attorneys' fees in common fund cases are:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Gunter*, 223 F.3d at 195 n. 1 (citations omitted). These factors do not have to be "applied in a formulaic way" and, "[e]ach case is different, and in certain cases, one factor may outweigh the rest." *Id*. In addition, the court should consider three additional factors: (1) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent

fee arrangement at the time counsel was retained, and (3) any innovative terms of settlement. *In re Diet Drugs*, 582 F.3d at 541 (citing *In re Prudential*, 148 F.3d at 338–40).

Lastly, Third Circuit "jurisprudence also urges a 'lodestar cross-check' to ensure that the percentage approach does not lead to a fee that represents an extraordinary lodestar multiple." *Cendant II*, 404 F.3d at 188; *see also Keller,* 2014 WL 5591033, at *14 (same). The Third Circuit has noted that a factor ranging between 1 and 4 is generally common. *In re Prudential*, 148 F.3d at 341. Here, nearly all of the *Gunter* and *Prudential* factors and the lodestar cross-check support the plaintiffs' attorneys' fees request of 31.6667% of the gross, claimed settlement fund.

### B.    The *Gunter* and *Prudential* Factors

The first *Gunter* factor, the size of the fund created and the number of persons benefitted, supports the attorneys' fees request. Generally, the appropriate percentage awarded to class counsel decreases as the size of the fund increases. *Keller*, 2014 WL 5591033, at *14. This idea is premised on the belief that increases in recovery are usually the result of the size of the class and not a result of the efforts of counsel. *In re Prudential*, 148 F.3d at 339. Thus, this first factor leads to less fees in "mega-fund" cases. *In re Cendant Corp. Litig.*, 264 F.3d 201, 287 (3d Cir. 2001) ("*Cendant I*"). The named plaintiffs posit and the court agrees that the basis for this mega-fund rule has

less application in FLSA opt-in actions. Unlike Rule 23 opt-out classes, counsel for FLSA must spend time and effort locating and notifying possible plaintiffs, who must then opt into the action to proceed. They are not absent class members and counsel may be required to directly communicate, interview, and work with these various opt-in plaintiffs.

Here, the action is a hybrid FLSA class action. Ultimately, the settlement will result in benefits to 839 class members, including the named plaintiffs, or about 63% of all possible plaintiffs (1,332 total). Of that percentage, almost half are plaintiffs who opted into the FLSA action at the start of the case. The total gross fund allocated to all class members amounts to $4,773,269.69, a sizeable but not extraordinary amount given the maximum gross fund agreed to by the parties. Thus, the court finds no indication that the parties' amended settlement agreement and the results of administrative have triggered a mega-fund warranting a reduction. As such, the court views the 31.6667% allocated to attorneys' fees as more than appropriate give the size of the fund, the moderate number of participating members, and the two types of class members included in the settlement.

The second *Gunter* factor, the presence or absence of substantial objections, also supports the request for attorneys' fees. As the court has indicated in several instances, there have been no objections to the settlement and no late objectors were present at the final hearing. This is yet another

indication that the resulting settlement is fair and an indication of the work expended by counsel in reaching a fair settlement.

The third *Gunter* factor, the skill and efficiency of the attorneys, also supports the request. As the court explained in its preliminary approval of the settlement agreement, class counsel Shanon J. Carson with the law firm Berger & Montague, P.C. previously provided a declaration to the court with the firm's resume attached as an exhibit. (Doc. 118-4). Attorney Carson currently serves as lead or co-counsel in employment and collective actions in federal courts around the country. (*Id*. ¶3). Berger & Montague, P.C. has represented clients in major class action cases for over 40 years. (*Id*. ¶3). The firm's resume supported this finding. (*Id*. Ex. A). In addition, attached to the motion for attorneys' fees and costs was a declaration from co-lead counsel, C. Andrew Head with the Head Law Firm, LLC. (Doc. 121-2). In it, Attorney Head explains that he is the founding partner of the law firm, which has a nationwide employment law practice. (*Id*. ¶3). Attorney Head provides a long list of FLSA and state wage and hour lawsuits he has participated in throughout the country. (*Id*.).

The court is confident that these attorneys are highly skilled in FLSA collective and hybrid actions as seen by their dealings with the court and the results achieved in both negotiating and handling the settlement to date. The court has held several conferences with class counsel and has, in some instances, requested briefing and explanation of various settlement terms. In

all instances, counsel has promptly provided the court with requested documentation and justifications for the settlement and has shown the ability to compromise, thereby reaching a settlement that is fair to all parties.

The fourth *Gunter* factor, the complexity and duration of the litigation, also favors the attorneys' fees request. This action was initiated in this court on October 8, 2013. (Doc. 1). It is nearly four years later. This action began as a collective FLSA action joined with claims under Pennsylvania law alone. As a result of information gathered during the mediation process, the case expanded to include claims under twenty-six other state wage and hour law regimes. The plaintiffs admit that some of these regimes would pose substantial difficulties if litigated to a trial. In addition, the defendant would have, if no agreement was reach, sought decertification of the FLSA action and would have opposed a Rule 23 certification motion. The defendant and the plaintiffs also disagreed over liability issues, particularly, whether or not the FWW overtime calculation used by the defendant was valid even if did not strictly comply with 29 C.F.R. §778.114. These issues not only made the case complex, they led to a great differences is original damages calculations. (*Id.* at 1–2). Working through these issues required three full-day mediation sessions. Thus, while the facts of this case have been relatively straightforward, the issues presented were complex and class counsel efficiently navigated these issues with the defendant to, ultimately, reach a fair compromise.

47

The court also finds that the fifth *Gunter* factor, the risk of nonpayment, also favors the requested award. There is no indication that the defendant is insolvent or close to insolvency and therefore would be unable to satisfy a judgment. *See In re Janney Montgomery Scott LLC Fin. Consultant Litig*., No. 06-3202, 2009 WL 2137224, at *15 (E.D. Pa. July 16, 2009) (explaining that this factor favors a fee application when the defendant cannot satisfy the judgment). Class counsel does, however, have a 40% contingency agreement in place with the original named plaintiff, Amador. *See Keller*, 2014 WL 5591033, at *15 (explaining the risk of nonpayment where a contingency agreement is in place). Thus, the risk of nonpayment is partly determined based on the risk of losing the case. Here, there were such risks, as fully explained above. Had the plaintiffs litigated this case and lost, class counsel would have been left with no reimbursement.

The sixth *Gunter* factor, the amount of time devoted to the case by class counsel, also favors the requested award. Attached to their motion for attorneys' fees, the named plaintiffs provided the court with declarations from Attorney Head and Attorney Carson, both serving as lead class counsel. (Doc. 121-2; Doc. 121-3). Collectively, these declarations indicate that class counsel, along with their associates and support staff, engaged in a total of 2434.1 hours of work in this case. There is nothing to indicate that this amount of work was somehow excessive. Although the parties did not engage in formal discovery, they did participate in extensive informal discovery and spent an

ample amount of time engaging in mediation, three full-day sessions to be exact. Class counsel held several discussions with the court after an initial settlement agreement was reached and this initial settlement was revised and amended based on those discussions. Additional briefing was also provided to the court when requested. The result of all that work is clearly seen in the parties final amended settlement agreement.

The court also finds that the seventh *Gunter* factor, the awards in similar cases, favors the requested award. "[C]ourts have approved attorneys' fees in FLSA [collective and class action] settlement agreements 'from roughly 20-45%' of the settlement fund." *Kraus*, 155 F. Supp. 3d at 534  (quoting *Mabry*, 2015 WL 5025810, at *4 (collecting cases)). "[A]n award of one-third of the settlement is consistent with similar settlements throughout the Third Circuit." *Creed*, 2013 WL 5276109, at *6 (citing *Martin v. Foster Wheeler Energy Corp.*, No. 3:06-CV-0878, 2008 WL 906472, at *5 (M.D. Pa. Mar. 31, 2008) (collecting cases)) (approving a one-third attorneys' fee arrangement in an FLSA overtime action); *see also In re Janney*, 2009 WL 2137224, at *16 (approving a 30% attorneys' fee recovery rate in a hybrid FLSA action). Accordingly, the court finds attorneys' fees of 31.6667% of the claimed settlement fund to be well within the range of acceptable fees in this action.

With respect to the additional *Prudential* factors, the court finds that the first added factor is neutral as it bears little weight in this action. The first factor, the value of benefits attributable to the efforts of class counsel relative to the

efforts of other groups such as government agencies conducting investigations, *In re Diet Drugs*, 582 F.3d at 541, has no application. There is no indication that the DOL was investigating the defendant's overtime compensation practices and, thus, there is nothing to compare. The court does note, however, that the efforts of class counsel are clearly seen in the final settlement as well as the added benefit from the defendant's change to its overtime compensation practices. Thus, as a result of the settlement process not only are those included in the settlement benefitted but current and future employees of the defendant will also receive benefits based on this litigation.

The second added factor, the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, does weigh in favor of the requested award. Generally, a request of "one-third of the settlement fund comports with privately negotiated contingent fees negotiated on the open market." *Brumlet v. Camin Cargo Control, Inc*., Nos. 08-1798 (JLL), 10-2461 (JLL), 09-6128 (JLL), 2012 WL 1019337, at \*12 (D.N.J. Mar. 26, 2012). Class counsel does have a 40% contingency agreement in place with Amador. *Cf. Lovett v. Connect America.com*, No. 14-2596, 2015 WL 5334261, at \*5 (E.D. Pa. Sept. 14, 2015) (noting a 40% contingent fee agreement in an FLSA hybrid action). Accordingly, the court finds that the request for 31.6667% of the claimed settlement fund for attorneys' fees falls within the acceptable range of privately negotiated contingency fees.

Lastly, the court finds that the final added *Prudential* factor, innovative terms of settlement, favors settlement. Here, the parties negotiated a void provision, or reverse "blow-out" provision, that uniquely accounted for the hybrid nature of the class claims and, more specifically, the relative weakness of Group 2 claims. While the provision was not exercised and favored the defendant alone, usage of this provision gave a layer of protection that made it possible for the defendant to move forward with settlement despite the many risks of litigation and the strength of its position. Class counsel's ability to navigate this unique provision while preserving settlement for as many as possible weighs in favor of the request for attorneys' fees.

## C.    The Lodestar Cross-Check

The court also finds that a lodestar cross-check comparing the percentage-of-recovery rate with the attorneys' hourly billing also supports the request for attorneys' fees. "The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 306–07 (3d Cir. 2005) (footnoted omitted) (citing *In re Prudential*, 148 F.3d at 342). The court should, however, take into account the hourly rates of the various attorneys working on the case and not a blended rate that might artificially reduce the multiplier. *Id*. at 306. "Furthermore, the resulting multiplier need not fall within any pre-

defined range, provided that the [d]istrict [c]ourt's analysis justifies the award." *Id*. at 307 (footnote omitted). While the court should not solely rely on a pre-defined range, the Third Circuit has noted that a factor ranging between 1 and 4 is generally common. *In re Prudential*, 148 F.3d at 341.

Attached to the request for attorneys' fees is a declaration from Attorney Head and Attorney Carson setting forth a summary of the hours and billing rates for all of the attorneys, senior to associate, and support staff that worked on this case. (Doc. 121-2; Doc. 121-3). Attorney Head provides that the lodestar for Head Law Firm, LLC totals $386,085.00 as of the May 8, 2017. (Doc. 121-2 at 6). Attorney Carson provides that Berger & Montague, P.C.'s lodestar totals $767,712.50 as of May 5, 2017. (Doc. 121-3 at 4). Thus, the total lodestar is $1,155,797.50. These numbers are based on an hourly rate of $550.00 for Attorney Head as lead counsel and $795.00 for Attorney Carson as co-lead counsel. When compared to the requested fee of $1,511,536.99, the cross-check results in a 1.3 multiplier. These numbers, including the multiplier, do not take into account any of the work that has occurred since the filing of the motion for attorneys' fees, including the final fairness hearing.

The court takes no position on whether or not Attorney Carson's and Attorney Head's hourly rates are reasonable and finds instead that the multiplier is low enough to take into account a range of hourly rates below those billed that would still warrant the court's approval even if this reduction would result in a higher multiplier. As the court has repeated in several

instances, the court views this to be an excellent settlement and would not hesitate to approve a multiplier above 1.3. The fact that the multiplier is so near the requested fees speaks directly to the skill and efficiency of the attorneys involved in this case, on both sides. Accordingly, the court will approve the requested 31.6667% percentage-of-recovery rate for attorneys' fees.

### D.    Costs

The named plaintiffs have also requested a total of $48,950.62 to reimburse class counsel's out-of-pocket costs. This is less than the $65,000.00 maximum agreed to by the parties in their amended settlement agreement. The court will approve these costs in full.

The FLSA explicitly allows for the reimbursement of any costs expended litigating the case. 29 U.S.C. §216(b). "Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 108 (D.N.J. 2001). Fees for travel, legal research, telephone and fax charges, photocopying, mail and postage, and fees for filing have all been held to acceptable and reasonably incurred during litigation. *Id*. at 108; *see also Keller,* 2014 WL 5591033, at *16 (approving filing fees and mediation fees as reimbursable expenses).

Here, the named plaintiffs request reimbursement for class counsel for a variety of expenses such as travel, photocopying, filing fees, research,

postage, and mediation fees. (Doc. 121-2 at 9–19; Doc. 121-3 at 11). The named plaintiffs provided documentation of these fees in the form of declarations from Attorney Head and Attorney Carson. (*Id*.; *id*). Attorney Head and Attorney Carson list the category and amount of the expenses. (*Id*.; *id*.). There is nothing on the lists provided that the court views as unreasonable or excessive given the length and complexity of this case. Accordingly, the court will approve the request for $48,950.62 to reimburse class counsel's out-of-pocket costs.[7]

## VI. CONCLUSION

In accordance with the above, the court will grant the named plaintiffs' motion for final approval of the parties amended settlement agreement, (Doc. 122), and grant the named plaintiffs' motion for attorneys' fees and costs, (Doc. 121). The court will finally certify the FLSA Collective Group for settlement and finally certify the Rule 23 State Settlement Class. The parties amended settlement agreement, (Doc. 118-3), will be finally approved. The court's approval will also include final approval of the named plaintiffs as

---

[7] In a footnote with their brief in support, the named plaintiffs advised the court that class counsel anticipated additional expenses would be incurred during the administration of the settlement and in preparation for the final fairness hearing. (Doc. 121-1 at 28 n. 11). They requested an opportunity to request additional reimbursement at the time of final distribution. (*Id*.). The court has not received any additional documentation with respect to reimbursable costs to date, but the named plaintiffs may request additional reimbursement for class counsel at the close of settlement.

representatives, $10,000.00 in service awards to the named plaintiffs, Dahl as settlement administrator, Dahl's costs totaling $15,882.00, and Berger & Montague, P.C. and Head Law Firm, LLC as class counsel. Attorneys' fees in the amount of 31.6667% of the gross claimed fund will be approved for a total of $1,511,536.99 in attorneys' fees. The court will also award reimbursement for out-of-pocket costs expended by class counsel in the amount of $48,950.62. An appropriate order shall follow.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATED: October 2, 2017**